**Opinion issued April 10, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-25-00854-CV

————————————

## IN THE INTEREST OF J.H, A.H, J.H., AND Z.H., MINOR CHILDREN

———

**On Appeal from the 306th District Court**
**Galveston County, Texas**
**Trial Court Case No. 23-CP-0087**

———

### MEMORANDUM OPINION

R.H. ("Mother") and D.H. ("Father") challenge the final decree rendered in a consolidated case terminating their parental rights to their minor children J.H. ("James"), A.H. ("Alex"), J.H. ("Joseph"), and Z.H. ("Zoe")[1] based on the court's

---

[1] We refer to appellants as Mother or Father, to the children by aliases, and to other individuals by their initials or relationships to the children or parents. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

findings that both Mother and Father committed the predicate acts under Texas Family Code Section 161.001(b)(1)(D), (E), and (L), and the termination of their rights was in the best interest of James, Alex, Joseph, and Zoe.

On appeal, both parents argue that the trial court lacked jurisdiction because the final decree was entered after the statutory dismissal date and the commencement and recess of trial was a sham to circumvent the Texas Family Code.

Both parents have challenged the legal and factual sufficiency of the evidence to support the trial court's finding that the Department made reasonable efforts to return the children before commencement of trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent. *See* Tex. Fam. Code § 161.001(f). Both parents challenge the legal and factual sufficiency to support the trial court's predicate act findings and its finding that termination of their rights was in the best interest of their children. Father also argues that the court abused its discretion by permitting the Department to amend its pleadings mid-trial.

We conclude that the trial court had jurisdiction when it entered its final decree because the earlier commencement and recess of trial was not a sham to circumvent the Texas Family Code. We affirm the trial court's termination decree.

**Background**

**I.      Family History with Department**

Mother has had eight children, four of whom she had with Father and are the subject of this case. The Department was involved with the family seven times between 2020 and November 2023, when James, Alex, and Joseph were removed. The allegations included neglectful supervision of the children, medical neglect, domestic violence, physical abuse of the children, intoxication (Mother), substance abuse (marijuana and cocaine, both parents). The medical neglect case was ruled out, and the two referrals from February and April 2020 were ruled "unable to determine." But in 2021 and three times in 2023, the cases were ruled "reason to believe" for neglectful supervision and physical abuse of at least one older child. In these instances, Mother or both Mother and Father tested positive for cocaine or cocaine and marijuana by hair testing. Due to concern about the parents' volatile relationship, a safety plan was put in place in late September 2023 requiring Father not to live with Mother and requiring both parents to remain sober.

**II.      Removal of James, Alex, and Joseph**

In November 2023, three of Mother's older four children were living with Mother and Father along with James (4), Alex (3), and Joseph (2). In early November 2023, Mother's fourteen-year-old son came home in the evening and found his mother intoxicated. The son complained about her intoxication, and a

3

verbal dispute turned physical. Mother threw an empty wine bottle at his head, broke two additional wine bottles, and threw glass shards at him. He was cut on his neck.

Galveston County Sheriff's Deputy Guyton testified at trial that he had responded to disturbances and family issues at Mother's and Father's house multiple times in 2023, and he did so in November 2023. Mother claimed that the disturbance was merely a disciplinary dispute because her son did not want to give up his cell phone. The son's wound was cleaned and treated by responding EMTs. Mother was arrested for injury to a child. Mother was heavily intoxicated at the time of her arrest, and she kicked Deputy Guyton as he led her, handcuffed, to his patrol car. Thus, she was also charged with assault on a public servant. The three older children left the home to stay with relatives and are not part of this case. Father was working and not at home when this incident occurred. He posted bond for Mother's release from jail because he needed her to care for James, Alex, and Joseph.

After the incident, Department investigator Marla Allen visited the family in person. She spoke to the parents and explained that the Department was concerned about the children due to the parents' history with the Department and ongoing issues with domestic violence and substance abuse. Mother believed she had not done anything wrong, and Father did not understand the Department's concern. He

4

believed that since the older children had left the home, the situation had been resolved. Allen spent several hours with the parents attempting to contact friends and relatives who could take custody of James, Alex, and Joseph, and when they were unable to find someone, the Department removed the children from the home and placed them in foster care.

According to Allen, when she removed them from the home that night, the children were dirty and hungry, they had full and dirty diapers, and though the parents packed a bag with belongings, it did not contain enough items to constitute even a single outfit for one child. She testified that she found "reason to believe" neglectful supervision by both parents of all three children, who were 2, 3, and 4 years old at the time of removal. The next day, she contacted Father to request additional clothes for the children, and he expressed that he still did not understand why the children had been removed. She testified that she explained the situation and concerns to Father "multiple times, multiple ways."

Hair samples were taken from the children after removal, and each tested positive for cocaine. As a result, on November 17, 2023, Mother and Father were each charged with abandoning or endangering a child. *See* TEX. PENAL CODE 22.041. They were arrested. Mother spent three or four months in Galveston County Jail beginning in January 2024. Each parent had three separate indictments: one for each child. On February 8, 2024, Father pleaded guilty and was placed on

five years' deferred adjudication community supervision, running concurrently on his three cases. On April 22, 2024, Mother pleaded guilty and was placed on five years' deferred adjudication community supervision, running concurrently on her three cases. Among other things, both parents' conditions of probation included the requirements to commit no crimes, "abstain from the use or possession of any drugs, except those taken or possessed under doctor's orders," "never become intoxicated," "abstain from the use of alcohol in any form at any time," participate in a drug screening program by submitting to a minimum of one drug test every 15 days. The conditions of probation stated that "failure to get a clean report from such drug screening may alone be sufficient to revoke his/her Community Supervision."

### III. Mother's Pregnancy, Zoe's Birth and Removal, Mother's Third Arrest

Not long after the children were removed, Mother became pregnant with Father's child. On June 30, 2024, she was admitted to Harris Health System for preterm labor. She was discharged the next day, and the discharge summary noted that "her alcohol level on admit was 0.34."

Zoe was born on August 17, 2024. When Zoe was two days old, Department investigator Rose Evans-Stinson met with Mother, who was still in the hospital. Mother informed her that she last used cocaine in 2023, and Mother denied drinking alcohol. Mother had no recollection of the June 30, 2024 admission at

Harris Health when she had an elevated blood alcohol content. The investigator tried contacting Father, but his phone number had been disconnected, so she initiated a search for him. At that time, Mother and Father were no longer living together, and Mother was living with E.E., an elderly woman, in Galveston. Due to the history of Department involvement, the ongoing case, Mother's history of substance abuse, and the more recent hospitalization with high blood alcohol content, the Department was concerned about a safe placement for Zoe. The investigator concluded that there was reason to believe that Mother had committed "neglectful supervision" based on her documented intoxication during the third trimester of her pregnancy with Zoe in violation of the orders entered in the ongoing case.

The investigator spent time with Mother trying to locate a suitable placement for Zoe, but when they were unable to locate such a placement, the Department sought custody of the newborn. Upon release from the hospital on August 20, 2024, the Department placed the baby with Mother's friend, L.P. The Department allowed Mother and L.P. to work out days and times of visitation because they were on good terms, with the caveat that Mother was to be supervised during all periods of visitation. While L.P. had custody of Zoe, Mother saw her daily.

A month later, on September 20, 2024, L.P. told Mother that she would no longer be caring for Zoe. Mother testified that she "freaked out" and took Zoe to

her friend E.E.'s house. At trial, Mother acknowledged that she lacked permission to take Zoe and that this was not a good decision. After a conversation with her counsel, Mother turned Zoe over to a Department caseworker around 10:00 p.m. that night. But when the new foster mother took custody, she noticed that Zoe was displaying signs of pain, grunting, and unable to move one arm. With permission from the Department, Zoe was taken to the hospital, where she was found to have suffered a spiral fracture to her left arm, which the hospital records described as a "nonaccidental injury to a child."

Mother was indicted for the felony offense of injury to a child "by criminal negligence, caus[ing] bodily injury to Z.H., a child 14 years of age or younger, by recklessly picking up the infant child in such a way as to cause a fracture in the child's arm." Based on this alleged offense and other violations of the conditions of probation, the State filed a motion to adjudicate Mother's guilt and revoke community supervision in each of the three cases of abandoning or endangering a child. For the third time in the course of this case, Mother was again confined in the Galveston County Jail. At trial, she testified that she had turned down a plea deal and had been in jail for about seven or eight months.

## IV. Trial Testimony

At trial, the Department presented testimony from M.H. (foster mother), T.J. Williams (the Department's conservatorship worker), Mark Knox (Court

Appointed Special Advocates volunteer), the Galveston County Sheriff's Deputy who responded to the incident with the thrown wine bottle, and the two Department investigators who investigated the removals of the boys and then Zoe.[2] The Department also introduced Family Service Plans, court orders, medical records, drug test results, indictments, orders of deferred adjudication, motions to adjudicate, Zoe's birth certificate, photographs, DNA test results, a report from Mother's psychosocial assessment, and various other documents. Mother also testified.

### A.    M.H.'s testimony

M.H. is the foster mother who welcomed James, Alex, and Joseph in November 2023. At the time of trial, Alex and Joseph remained in her home, along with her three biological children. She testified that while she is licensed as a foster-to-adopt placement, she did not intend to adopt Alex or Joseph, but they were welcome to stay in her home as long as needed to find them a permanent placement. Because M.H. is a stay-at-home mother, she was with James, Alex, and Joseph all the time when they initially came into care.

*James.* M.H. said that James was in her home for about 13 months before he was moved to an adoptive placement at the end of 2024. She said he had just turned 4 years old when he arrived, and she described his behavior as "typical,"

---

[2]    The testimony of the Galveston County Sheriff's Deputy and the two Department investigators has already been detailed in sections II and III, above.

noting that he easily became upset, displayed jealousy with his siblings, and had difficulty sharing. He attended weekly play therapy to learn to use words instead of emotional outbursts and to learn to share. M.H. took him to all his appointments.

*Alex.* Alex was almost 3 years old when he came into foster care. At first, he had outbursts involving throwing himself on the ground, hitting and kicking his brothers and other family members, hurting himself, throwing things, and screaming. Alex had difficulty with eye contact, speech delays, and repetitive behaviors. He was diagnosed with autism, for which he receives 10 hours a week of Applied Behavioral Analysis (ABA) therapy at home. M.H. said the ABA therapy is typically three or four days a week from the time Alex comes home from school until bedtime. The ABA therapy is helping him learn to communicate about toileting needs, share toys, be gentler with caregivers and siblings, and reduce the duration and frequency of tantrums. He attends a full-day special education program at a local public school, and he rides a bus. Alex receives 30 minutes of group speech therapy weekly at his school.

M.H. testified that Alex's speech has improved during foster care, and he now speaks in sentences. Though he still has daily tantrums, she finds that he can be redirected, and he less frequently throws himself on the ground. However, sometimes he hurts himself during tantrums. She said that his tantrums tend to be

triggered by wanting something that another person has, being told "no," and times of transition. He does not display stimming behavior.

M.H. said that Alex takes a "tiny dose" of clonidine at bedtime to help him sleep. Though it has been effective for about a year, his doctor is considering transitioning him off of the medication.

***Joseph.*** Joseph was 2 years old when he came into foster care. M.H. said that Joseph had some speech delays and difficulty expressing himself when he arrived. Initially, she took him to multiple early childhood intervention appointments each week. She also ensured that he received twice monthly therapies at home. Most of the therapies and interventions were aimed at addressing speech and motor skills. At trial, she said that Joseph attends afternoon, half-day pre-kindergarten at the local public school where he receives special education instruction. He receives 30 minutes of group speech therapy once a week at school, and 45 minutes to one hour of speech therapy every other week at UTMB. As a result of the interventions and therapies, Joseph is now talking more and better able to express his wants and needs. She said he still has some tantrums, and they are working on that aspect of his behavior.

Joseph, who sees a behavioral doctor every three months for sleep issues, wakes early about twice a week, remaining awake for four hours. When he awakens early, he displays "stimming" behavior. M.H. said that she usually stays

11

awake with him. Sometimes he displays stimming behavior during the day as well, and M.H. testified that she had been advised to ignore the behaviors unless he is harming himself. Joseph wears a helmet every day because he sometimes hits his head. At the time of trial, he was still in diapers. Joseph takes melatonin at night to help him calm down and sleep.

M.H. said that both Alex and Joseph have hit her, her husband, their three biological children, and their older brother James. Both become emotional after visits with Father, crying, screaming, and having difficulty falling asleep. Joseph routinely wakes up around 2:00 a.m. after visits with Father. She said they display similar behaviors after visits with Mother, especially being emotional and crying. However, neither displayed any reaction when James was moved to an adoptive placement.

### B.      Department Caseworker T.J. Williams's Testimony

Williams testified that he had been assigned to the case involving James, Alex, and Joseph since just after they were initially removed to foster care. He later also became the conservatorship worker for Zoe.

*James.* Williams testified at trial that James had been in his placement five or six months, and the foster parents have expressed interest in adopting him.

*Alex and Joseph.* Because Alex and Joseph were not in an adoptive placement, the Department planned to search for a permanent placement for them.

He said that because of the autism and developmental delay diagnoses, it "would be a more delicate process." However, Williams testified that neither Alex nor Joseph would be moved except to an adoptive placement. Williams also said that when Alex was initially diagnosed and the children were receiving therapy, he invited Mother and Father to attend, particularly because he wanted to ensure that they understood Alex's autism diagnosis and could be equipped to deal with those behaviors if the children were reunified with the parents. Mother did not attend the therapies, but Williams acknowledged that it was possible she had a conflict with employment. Father attended only one session, and when he was invited to other appointments, he said that he was working.

Williams testified that Joseph is suspected to be on the autism spectrum and has a diagnosed speech disorder for which he receives speech therapy at school once or twice a week.

*Zoe.* Williams testified that Father was confirmed by DNA testing to be the biological father of Zoe. He testified that she is in an adoptive placement, and the caregivers work with him to facilitate sibling visitation at least twice a month. He mentioned there was an additional visit for her recent birthday. He said the children are all familiar with each other and have an opportunity to interact.

Williams testified that while Mother's family service plan required her to remain alcohol-free, she was hospitalized in the third trimester of her pregnancy

with Zoe with a blood alcohol content of 0.34. Williams said this concerned the Department because he believed that "level of intoxication . . . could be significantly damaging to the infant," but he acknowledged that Zoe did not test positive for alcohol at birth and was not showing signs of fetal alcohol syndrome.

Williams testified about the night Mother took Zoe from L.P.'s home and later returned her to Williams at a nearby firehouse. He said that he took the baby back to L.P.'s house to retrieve some care items before taking her to her foster care placement around 9:00 or 10:00 p.m. When he returned home about 20 minutes later, the foster mother called and told him that Zoe's "arm was not moving correctly and that she was very fussy and upset." Williams joined the foster mother and Zoe at the hospital, where Zoe was diagnosed with a fractured arm. He said she did not need surgery because she was able to heal with immobilization.

He testified that this incident was the basis for Mother's recent indictment, which was pending, along with the motions to adjudicate on the three earlier counts of child endangerment.

***Mother.*** Williams testified that Mother missed a number of her visits with the children, including some because she attempted to confirm just outside the required 24-hour window. Williams testified that he tried to work with Mother on that by offering to set up text or email reminders or an alarm and by reminding her that she did not need to confirm only the day before the visit and that she could

14

confirm much earlier. He also agreed to virtual visits with the boys when Mother was pregnant with Zoe and informed Williams she needed to be on bed rest.

Williams said Mother had monthly visits with the boys and weekly visits with Zoe after she was placed in foster care. He testified that Mother attended around half of the visits with the boys, but she missed over half of the visits with Zoe. Williams testified that the visits with the boys went "okay," but there "were a couple of days where some concerning things occurred." For example, once when she was pregnant with Zoe, Williams witnessed her grab James "in an aggressive manner" after he ran from her to play on the slides instead of staying with her and his little brothers. Williams said she once brought gifts for the children and prepared a meal for one visit early on. He testified that Mother was prepared for visits with Zoe, and she brought a homemade lotion she used when changing her. Williams said that Mother's behavior at some visits made him question her sobriety.

Williams testified that Mother completed many of the services on her family service plan. Williams said he went over the family service plan with Mother twice in depth and once in a rush. Mother completed parenting class, she was doing individual therapy while in jail, she built a support group, she completed a drug and alcohol assessment, she participated in some random drug testing. Williams testified that Mother had multiple urine drug and alcohol tests that were negative,

15

and two positive tests for alcohol. He also testified that she tested negative on hair follicle testing in June 2024, but she twice refused hair follicle testing.

Williams testified that Mother did not provide stable housing. He visited the house she shared with E.E., an elderly woman, in Galveston. He testified that the first time he saw the residence it showed damage from flooding, including a hole in the living room floor that permitted entry of pests. At one point, he saw roaches gathered at the top of the ceiling. A few months later, there was evidence of repairs, but the floor was unfinished, and he noticed issues with cleanliness. He said the house "still wasn't safe for any youth." Mother told Williams that she did not have a lease, but she had an agreement with E.E. to perform various tasks in exchange for living there.

Williams testified that in addition to the disrepair of the house, return of the children to Mother to live with E.E. was problematic because he had not been able to run a background check E.E.'s adult son who either lived in the house or frequently had access to it. He testified that he did not recall whether he had asked the son for identifying information to run the background check, but E.E. had refused to provide the information.

On the last day of trial, in September 2025, Williams testified that Mother was in the Galveston County Jail awaiting a court date on her charge of injury to child regarding the fracture of Zoe's arm. Williams said that Mother's

16

incarceration was an impediment to reunification because there is no way to do a monitored return of the children when the parent is in jail.

Williams testified that he made efforts to help Mother reunify with her children, by assuring her classes and services continued, reaching out to contact family members, and working with Mexican consulate regarding a potential placement. He said he visited Mother four or five times in the Galveston County Jail. He said he saw Mother in September 2025, reviewed aspects of the case, and showed her a slideshow of all her children.

Mother spent a few months in Galveston County Jail beginning in January 2024. Mother's psychosocial assessment found that she had "experienced significant trauma and abuse during childhood and has continued this pattern with her own children. She has a history of involving herself with abusive partners which likely stems from her childhood." Mother was diagnosed with major depressive disorder and alcohol abuse. Individual counseling was recommended, and she participated.

Throughout the case, Mother lived in a variety of places, including homeless shelters, motels, on friends' couches, and with E.E. Mother told the Department that she worked for close family friends and neighbors, and that she worked three days a week for a local beauty supply store. The record did not include evidence of how long she worked there or how much she earned.

17

Williams testified the Department would not consider returning the children to Mother because she had not provided proof of residency, she was currently incarcerated, and there was a lingering question about her sobriety. He also said he had not seen a positive change in Mother's behavior, and he believed it was in the best interest of all the children for Mother's rights to be terminated.

*Father.* Williams testified that Father had a history of domestic violence and substance abuse and was unable to meet the children's basic needs.

Williams testified that Father's visits with the boys "went really, really well." He said Father missed at least five visits with them, but he did not regularly visit with Zoe. He said Father mostly said he missed visits with Zoe due to his work schedule or being "busy." At one point, Father said he was being evicted. Father missed "a lot" of visits with Zoe because he failed to confirm at least 24 hours in advance. While Father claimed to miss visits with his children due to work, Williams testified in September 2025 Father had not provided a check stub in the preceding six months, and that the last check stub he saw from Father was from December 2024. Williams testified that he told Father if he could provide proof of employment, the Department would add time to the next visit or add a Saturday visit.

Father was required by his family service plan to demonstrate sobriety through urine and hair follicle testing. Father's family service plan, like Mother's,

states: "Throughout the life of this case, [Father] will submit to random drug testing (urinalysis or hair follicle) at the discretion of the Department. All drug tests will produce a negative result. A photo ID is required to take all drug tests. If [Father's] drug tests are adulterated, or he fails to submit to testing on the requested date, the test will be treated as a positive test."

Father tested positive for cocaine by urinalysis in July 2024, for cocaine by hair follicle analysis in August 2024, and for cocaine by urinalysis in April 2025. Williams also testified that Father tested positive in January 2025 for cocaine based on a test required by community supervision.

Williams said Father participated in less than half of the requested random drug tests. On more than one occasion, Father submitted for the urinalysis test, but not on the date requested, which allowed him to "dilute or cheat the test." Father missed more than one urinalysis test completely. Father refused hair follicle testing after the positive result in April 2025. Williams said: "At the level in which his hair follicle produced in April, the Department would want to see another hair follicle of a decreasing result." Williams also said that he had seen Father with a beard multiple times since April 2025, and Father had enough facial hair to submit for testing. Williams frequently reminded Father about residency, proof of employment, and submitting to hair follicle testing. Williams testified that missed drug tests are considered to be positive test results.

19

Earlier in 2025, Williams visited the home where Father was living and observed both serious and minor issues. Father had duct taped a microwave to the wall, creating a hazard because it could fall on a child. The home had power but limited light. It was excessively dusty and needed cleaning. Williams offered to bring Father cleaning supplies and help him clean the residence the following weekend, but Father declined the offer. Father later told Williams that he was being evicted from that home. But at trial Williams said he was not certain where Father lived. Father had refused to provide the information or promised to bring it with him to visits with his children and failed to do so.

Williams testified that Father had provided only three or four check stubs proving that he was employed. Williams testified in September 2025 Father had not provided a check stub in the preceding six months and that the last check stub he saw from Father was from December 2024. Father repeatedly promised to bring the documentation to visits with his children, but he did not. Father told Williams that he worked for Amazon or a third-party company that did package handling and delivery for Amazon. However, Father had filed a pauper's oath application on August 18, 2025, in a criminal case pending in Galveston County. While the nature of the criminal charges was not disclosed at trial, the content of the pauper's oath application showed that Father had "$0" in earnings and "$0" at home, in savings, in checking, owed to him, or in a safety deposit box. Father listed "Galveston

20

Yacht Marina" as the last job he had or efforts to gain employment, but Williams said Father never mentioned working there. Williams said that the address on the pauper's oath application was the same address from which Father said he had been evicted.

Williams said Father was living with his girlfriend, K.W., who leased the home in her name. Williams said he looked into K.W.'s background and found two concerning elements that would have prevented the Department from placing the children in a home with her.

Williams testified that he did not believe that Father understood Alex's or Joseph's special needs and had only expressed "a limited capacity" for willingness to learn about autism and necessary therapies. Williams testified that he did not believe it was safe to return the children to Father because he did not know where Father lives, whether he is sober, or the nature of his relationship with K.W. He believed it was in the best interest of all the children for Father's rights to be terminated.

### C.    CASA Mark Knox's Testimony

CASA volunteer Mark Knox testified that he had been working the case since James, Alex, and Joseph were removed, about 22 months in total by the time of trial. He said that he visited the children and the foster families in their homes, attended doctor's appointments and therapies, observed visits with Mother and

Father, and interacted with their schools. On average, he estimated that he interacted with the children at least once a week.

*Zoe.* Mark testified that Zoe had been in a foster-to-adopt placement since February 2025, and she was the only child in the home. He said she was doing "very well." He testified that Zoe was up-to-date on all medical and dental appointments, was developmentally on target, and had no special needs. He said that CASA's goal for Zoe was termination of parental rights and adoption. Knox testified Father attended 6 of 23 visits scheduled with Zoe, and Mother attended 6 of about 21 scheduled visits with Zoe. Knox testified that Father's visits with Zoe were "okay," and that he has been attentive to Zoe, talking to her, playing with her, and cuddling with her. As to Mother's visits, he said, "She, especially at first, was nurturing but sometimes she would also get kind of emotional and almost erratic and would quite frequently end the visit very abruptly."

*James, Alex, Joseph.* Knox was aware that all three boys had tested positive for cocaine just after removal. Knox testified that James's adoptive placement was going well, that he was succeeding in school, attending lots of activities, and was nurtured.

*Mother and Father.* Knox testified that Father attended 16 of 23 visits scheduled with the boys. He testified that Father's hour-long visits with the boys went "fairly well." He described Father as attentive and nurturing. Mother attended

22

more than half of the 16 visits scheduled with the boys but not as many as Father attended. Knox testified that Mother's visits with the children "go okay," but that she "can be distracted," "can get agitated," and "is not as capable of supervising them, keeping them in control." Knox testified that he did not believe that either parent had the skills and knowledge to pursue autism therapies with Alex and Joseph. As to Father, he based his opinion in part on his in-person observations of Father, his home, and Knox's opinion that Father "cannot even establish a safe home for himself."

Based on Mother's testimony about Father's use of cocaine, Knox was concerned that Father was still using cocaine. Knox testified that it was in the best interest of all the children for their parents' rights to be terminated because neither had "established [a] safe place to live, stable employment, they haven't avoided criminal activity, they haven't maintained sobriety." He believed that returning the children to the parents would create a risk of the children regressing and experiencing future trauma. He said he had not seen a positive change in Father's behavior or Mother's behavior and that there would be no benefit in returning the children to their parents. He also testified that neither parent had given any proof to him that he or she could provide a safe home for the children. Knox also considered the parents' positive drug tests during the course of the case, their lack of income, and Mother's incarceration. He also testified that he had tried to make

contact with people whose names Mother or Father gave him as potential placements for the children.

**D.        Mother's Testimony**

Mother was 39 years old when she testified at trial in September 2025. She is the mother of eight children. Two live with relatives in Arlington, Texas, one lives with his father in Houston, and five are in foster care. Four are the subject of this case.

Mother said that in November 2023, she was drinking alcohol on weekends, but she did not recall how much she drank. She denied being intoxicated during the incident in which she threw a wine bottle at her son. She said alcohol did not affect her judgment, and it was a dispute about his cell phone. She acknowledged that it was not a good decision, but she said she wanted his phone because the family was about to have dinner. She said the three little boys were in the living room during the altercation with her teen son. Mother also acknowledged that she was working on services with the Department at the time, and she was supposed to remain drug- and alcohol- free. She denied seeing any injury on her son. She testified that she spent a week in jail and was sentenced to time served.

Mother testified that she was on deferred adjudication community supervision for child endangerment stemming from the little boys' positive cocaine tests. She said she had to follow conditions including reporting to a probation

24

officer, completing community service, paying fees, discontinuing communication with Father, submitting to drug testing, and avoiding more criminal charges.

Mother initially admitted that she had previously used marijuana but denied ever using cocaine. She said she was aware that Father used cocaine when the children were asleep. She said he used cocaine in the bathroom (a bathroom accessible to the children), and she could tell he had used based on his behavioral changes and the money missing from their account.

Mother then admitted that she used cocaine with Father once a month in an attempt to keep him from going to bars and spending the family's rent money. She said she was charged with child endangerment for allowing cocaine to be in the house around the children. She acknowledged a point of view from which that could be wrong, but she said, "From my point of view, I just try to keep a roof over my kids' head." In November 2023, Father was the sole breadwinner for the family. She said she could not kick him out of the house because his name was on the lease.

In January 2024, she was in the Galveston County Jail for three or four months. After that, she lived in shelters or with friends before living with E.E. for about six months. Mother said she primarily worked for E.E., but she also worked at "the cotton shed" in Galveston for a month because her schedule was 7 days a week, 13-hour shifts, and that schedule did not allow her to see her children.

At trial in September 2025, Mother said she had been in Galveston County Jail for seven months and had turned down a plea deal. She said the Department went over the family service plan with her, and it was mentioned in court, but she did not really understand what she had to do. She was not sure what services were left to be completed on her family service plan, and she believed she had complied with drug testing. She did, however, acknowledge missing some drug tests due to lack of transportation. She said she asked for help with transportation but did not receive it.

Mother said that before the boys were removed, Father would sometimes leave her at home for days at a time without a phone, car keys, or car seats for the children. A neighbor brought her groceries and sometimes took her to the store. Mother also talked about growing up with parents who struggled with substance abuse and homelessness.

Mother said: "I've learned that trying to be around people that drink and do drugs is not worth me losing my kids." She planned to live with E.E. when released from jail and look for a job when positions opened at a plant or where her friends worked. She testified that she believed the children would be safe with her and that she had made corrections in response to observations shared with her during supervised visits. She said that E.E.'s house was being repaired. She said that she tried to build a support group in church because her family is not

26

supportive. Mother acknowledged having post-partum depression after Zoe was born, and while she denied other mental health issues, she admitted taking medication for depression.

Mother denied ever placing the children's health or safety in immediate danger. She testified about obtaining employment and maintaining sobriety to meet the children's needs. She said that the children mostly need a mentally stable mother–that they need her, and she needs them. She said she knows "what's best for them," and would help them become productive adults. She imagined spending birthdays and milestones with them and having a healthy future. Mother testified that she understands Alex's and Joseph's special needs, but she had not researched autism because she had no internet access in jail, and they had not been diagnosed before removal. She said she would take them to all their appointments if reunited with them.

## V.    Ruling

The trial court found that both Mother and Father committed the requisite predicate acts under Texas Family Code Section 161.001(b)(1)(D), (E), and (L), and the termination of their rights was in the best interest of James, Alex, Joseph, and Zoe. Mother and Father appealed.

27

**Analysis**

**I.      Jurisdiction**

Both parents argue that the trial court lacked jurisdiction to terminate their parental rights because the dismissal deadlines had passed in each case before the cases were consolidated. They argue that the "start/stop" hearings were shams used to circumvent the statutory dismissal deadlines.

**A.      Standard of Review and Legal Principles**

A challenge to a trial court's subject-matter jurisdiction presents a question of law that we review de novo. *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). An order resulting from judicial action rendered after a trial court loses jurisdiction is void. *In re D.S.*, 602 S.W.3d 504, 512 (Tex. 2020).

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Id.* at 759. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe the

involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

"The Texas Legislature enacted Texas Family Code section 263.401 to encourage prompt resolution of suits in which the Department of Family and Protective Services requests termination of the parent-child relationship or requests that the Department be named conservator of a child." *Interest of G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021). "The purpose of section 263.401 is to prevent children from languishing indefinitely in foster care." *In re M.C.M.*, 57 S.W.3d 27, 36 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). "Section 263.401 does this by requiring trial courts presiding over such suits to commence the trial on the merits within one year after the initial temporary order." *G.X.H.*, 627 S.W.3d at 292. "In extraordinary circumstances defined in section 263.401(b), trial courts may extend that one-year deadline, or 'dismissal date' in the parlance of the statute." *Id.* The trial court may retain the suit on its docket for an additional 180 days beyond the one-year deadline if it finds that (1) extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the Department; and (2) continuing the appointment of the Department as temporary managing conservator is in the best interest of the child. TEX. FAM. CODE § 263.401(b). "But if the trial court neither commences trial by the dismissal date nor extends it in accordance with section 263.401(b), the statute dictates a dire

consequence: the trial court's jurisdiction over the suit 'is terminated and the suit is automatically dismissed.'" *G.X.H.*, 627 S.W.3d at 292 (quoting TEX. FAM. CODE § 263.401(a)).

To "commence[ ] the trial on the merits" under section 263.401 "requires more than a putative call of the case and an immediate recess in order to comply with the statute." *In re Z.S.*, 631 S.W.3d 313, 318 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (internal quotations omitted). Factors that reviewing courts have considered include the trial date recited in the final order and, in the time between calling the case and recessing on the putative commencement date, whether (1) preliminary matters were addressed, (2) parties announced "ready," (3) opening statements were made, (4) witnesses were sworn, (5) witnesses were called to testify, and (6) exhibits were admitted. *In re J.L.J.*, 645 S.W.3d 294, 295–96 (Tex. App.—Houston [14th Dist.] 2022, pet. denied); *see, e.g.*, *In re R.J.*, 579 S.W.3d 97, 109–10 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (holding that trial on merits commenced where witnesses were sworn, counsel announced ready, pretrial matters were discussed, and witness testified briefly before trial court recessed).

## B.     Trial court had jurisdiction in this case

This case began as two separate removal cases with termination petitions that were later consolidated. The first case involved the removal of James, Alex,

and Joseph, Cause No. 23CP0087, and the trial court entered a temporary order appointing the Department as temporary managing conservator of these children on November 13, 2023. The first Monday after the first anniversary of this date was November 18, 2024. *See* TEX. FAM. CODE § 263.401(a). The trial court extended the dismissal date to May 17, 2025, and set the case for trial on April 21, 2025. *See* TEX. FAM. CODE § 263.401(b).

The second case involved only the removal of Zoe, Cause No. 24CP0079, and the trial court entered a temporary order appointing the Department as temporary managing conservator of Zoe on August 20, 2024. The first Monday after the first anniversary of this date was August 25, 2025. *See id.* § 263.401(a).

The trial court commenced trial in the first case on May 5, 2025. Without specifically asking whether the parties were ready for trial, the trial court took announcements from counsel for the Department, Mother, Father, the children, as well as the court appointed special advocate. The Department's representative and Father were present. The trial court swore in witnesses, and it asked if there were preliminary matters to address. The Department asked for a stipulation to proceed without the presence of Mother who was confined as an inmate at the time. The stipulation was made. Her attorney explained that he had difficulties bringing her to court because they anticipated a brief proceeding that day. Counsel for Father and the ad litem for the children stated that they had no objections, and the

31

Department called its conservatorship worker, Theodore Williams, who testified about the case. Williams testified that Mother had completed most but not all of the requirements of her family service plan but that she was in jail at the time on a charge of injury to a child. The court then recessed the trial.

The trial court commenced trial in the second case on August 11, 2025. Without specifically asking whether the parties were ready for trial, the trial court took announcements from counsel for the Department, Mother, Father, and the guardian ad litem for Zoe. Mother, Father, two Department caseworkers, the guardian ad litem, and the CASA volunteer were present. The trial court swore in witnesses, but the record does not identify them by name. The Department called Mark Knox, the CASA volunteer. He testified that he is familiar with Zoe, had been on the case continuously since August 20, 2024, had visited her in her placement, and attended or reviewed records from medical and dental updates. He testified that Zoe had been in foster-to-adopt placement since February 2025, and she is the only child in that home. When she was originally taken into custody, she was in a fictive kin placement with Mother's friend, L.P., before being placed in a foster home. He testified that Zoe would be one year old in about a week, on August 17, 2025. He said that she is up to date on medical and dental care, developmentally on target, and has no special needs. He testified that CASA's recommendation was unrelated adoption with the current foster-to-adopt family

32

because both parents had failed to establish a safe, stable home environment, stable employment, and demonstrated sobriety. In addition, he mentioned Mother's history of drug and alcohol use and the fact that she was then being held in the Galveston County jail. Father is not an option for CASA because he has not established a safe, stable home environment, stable employment, and is not drug or alcohol free. Knox testified that he had observed visitations between each parent and Zoe. He said that Father's visits went well, and he described Father as attentive and nurturing. He described Mother's visits as "okay," but he described her as less attentive, distracted, and possibly agitated. The Department stated it would like to do more direct examination later, and everyone declined to cross. The Department said it was not prepared to admit exhibits at that time. The court recessed the trial.

On September 22, 2025, the trial court called both cases and ordered their consolidation. Trial continued with admission of evidence and witness testimony that concluded the next day.

In this case, the trial court did more than "a putative call of the case and an immediate recess" on May 5, 2025, and August 11, 2025. In the trial court's final order, it recited that it heard the case on May 5, 2025, August 11, 2025, and September 22, 2025. On both May 5, 2025, and August 11, 2025, the court took announcements, witnesses were sworn, and witnesses testified. On May 5, 2025, the court also addressed a preliminary matter. Considering the relevant factors, we

33

conclude that trial on the merits commenced on May 5, 2025, and August 11, 2025. *See J.L.J.*, 645 S.W.3d at 295–96; *R.J.*, 579 S.W.3d at 109–10. We overrule Mother's and Father's first issue.

## II.     Sufficiency of the Evidence

Both parents have challenged the legal and factual sufficiency of the evidence to support the trial court's finding that the Department made reasonable efforts to return the children before commencement of trial on the merits and despite those reasonable efforts, a continuing danger remained in the home that prevented the return of the child to the parent. *See* TEX. FAM. CODE § 161.001(f). Both Mother and Father challenge the legal and factual sufficiency of the evidence supporting each of the trial court's predicate findings under Section 161.001(b)(1) of the Family Code—endangering conditions under subsection (D), endangering conduct under subsection (E), and conviction or placement on community supervision or deferred adjudication community supervision for "serious injury of a child" under specified provisions of the Texas Penal Code under subsection (L)—as well as the finding that termination of their parental rights was in their children's best interest under Section 161.001(b)(2). *See* TEX. FAM. CODE 161.001(b)(1)–(2). We consider only the subsection (D) and (E) and best-interest findings because they are dispositive as to both parents.

## A. Clear and Convincing Evidence; Legal and Factual Sufficiency Standard of Review

Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. Because of the elevated burden of proof in a termination case, we do not apply the traditional formulations of legal and factual sufficiency on appeal. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In a factual-sufficiency review of termination findings, we weigh disputed evidence contrary to a finding against all the evidence favoring the finding. *A.C.*, 560 S.W.3d at 631. The evidence is factually insufficient if, in view of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the Department's allegations were true. *Id.*

In both legal and factual sufficiency review, the factfinder resolves conflicts in the testimony, weighs evidence, and draws reasonable inferences from the

35

evidence that it chooses to believe. *Interest of C.E.*, 687 S.W.3d 304, 308–09 (Tex. 2024); *see In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (factfinder is sole arbiter of witness credibility and demeanor, and therefore appellate courts must defer to factfinder's factual determinations). We must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, but we should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *C.E.*, 687 S.W.3d at 308. We may not substitute our judgment for that of the factfinder. *Id.* at 309.

## B. Reasonable Efforts and Continuing Danger

Within her second issue and his third issue, Mother and Father argue that the Department did not prove that it met its requirement to make reasonable efforts to reunite them with their children or to show that despite such efforts, a continuing danger remained in the home that prevented the return of the children to them.

### 1. Law: Reasonable Efforts

The Texas Family Code provides that,

> In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:

>> (1) the department made reasonable efforts to return the child[ren] to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger

36

remains in the home that prevents the return of the child[ren] to the parent . . . . .

TEX. FAM. CODE § 161.001(f).

Although Section 161.001(f) was enacted in 2023,[3] "[t]he phrase 'reasonable efforts to return the child[ren] to the parent' is not new[.] . . . [I]t appears in Section 161.001(b)(1)(N)." *In re M.N.M.*, 708 S.W.3d 321, 328 (Tex. App.—Eastland 2025, pet. denied) (quoting TEX. FAM. CODE § 161.001(b)(1)(N)). We presume that the Legislature enacted this amendment "with full knowledge of the existing condition of the law and with reference to it." *JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 486 (Tex. 2019) (quoting *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677 (Tex. 2007) (orig. proceeding)). Thus, when considering whether the Department proved by clear and convincing evidence that it made reasonable efforts to return the children to Mother and Father, we look to relevant jurisprudence construing the Department's reunification efforts under subsection 161.001(b)(1)(N). *M.N.M.*, 708 S.W.3d at 328–29 (citing *In re Facebook, Inc.*, 625 S.W.3d 80, 92 (Tex. 2021) ("[W]hen faced with a statute that reasonably lends itself to multiple readings, we promote stability and predictability in the law by adopting the position unanimously taken by other courts if the text permits.")).[4]

---

[3]     *See* Act of May 25, 2023, 88th Leg., R.S., ch. 675, §§ 1, 7, 2023 Tex. Gen. Laws 1644, 1644–45.

[4]     "Our sister courts of appeals that have examined subsection 161.001(f) have reached this same conclusion." *D. F. v. Tex. Dep't of Family & Protective Servs.*,

"This Court and others have held that [the Department's] implementation of a family service plan, 'standing alone,' constitutes a reasonable effort to return a child to the parent." *In re K.W.*, No. 01-23-00530-CV, 2024 WL 116938, at *5 & n.5 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.) (collecting cases). "The inquiry is whether DFPS made 'reasonable efforts, not ideal efforts.'" *K.W.*, 2024 WL 116938, at *5 (quoting *In re F.E.N.*, 542 S.W.3d 752, 766–67 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)).

## 2. Sufficient Evidence the Department Made Reasonable Efforts to Reunite Parents and Children

Both parents acknowledge that the Department developed and implemented a family service plan. However, both parents assert that the Department is statutorily required to implement a family service plan, pay for or provide services, contact family members when children are removed from their parents, and facilitate visits between parents and children. Without citation to authority, Mother argues that the inclusion of section 161.001(f) in 2023 necessarily indicates the Legislative intent for the Department to make efforts that they were not already required to make. For example, Mother argues that the Department should have

No. 03-25-00738-CV, —S.W.3d—, —, 2026 WL 482451, at *8 (Tex. App.—Austin Feb. 20, 2026, pet. struck); *see, e.g.*, *In re A.C.*, No. 06-25-00084-CV, 2026 WL 878798, at *10–11 (Tex. App.—Texarkana Mar. 31, 2026, no pet. h.) (mem. op.); *In re K.N.S.*, No. 12-25-00171-CV, 2025 WL 3724545, at *9 (Tex. App.—Tyler Dec. 23, 2025, pet. filed) (mem. op.); *In re M.B.*, No. 14-25-00418-CV, —S.W.3d—, —, 2025 WL 3275376, at *8 (Tex. App.—Houston [14th Dist.] Nov. 25, 2025, no pet. h.).

assisted her with transportation, provided her with a cell phone, called providers to make appointments for her, provided her with furniture, or helped her locate housing or a job. We disagree. When the text of a statute is clear, the text itself is determinative of Legislative intent. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). Section 161.001(f) does not mandate any particular actions that the Department must take to demonstrate that it made reasonable efforts to return the children to the parents. *See* TEX. FAM. CODE § 161.001(f).

In this case, the evidence showed that the Department implemented a family service plan for each parent. The Department worked to find relative or fictive kin placements for the children, going so far as to work with the Mexican consulate to look for Mexican national relatives who may have been appropriate caregivers for the children. Williams testified that he invited the parents to attend therapy for Alex to help them learn about his autism diagnosis and how to care for him if he were reunited with them. He facilitated visitations and offered to help the parents comply with the requirement to confirm availability for visits at least 24 hours in advance with text or email reminders or alarms. Williams facilitated remote visits between Mother and the boys when she told him she had to remain on bedrest while pregnant with Zoe. Williams testified that he knew there were times when Mother did not have a car and told him she lacked transportation to a drug testing facility. He acknowledged that he did not offer her a ride and told her she could

walk to the facility. He testified that he ensured her classes and services continued to allow her to work on the services required in the family service plan. He also said that he visited her in jail and brought her updates and a slideshow about her children. When Father told Williams that he could not attend a visitation due to his work schedule, Williams offered to extend future visits or schedule an additional visit if only Father would provide proof of employment. Williams offered to bring Father cleaning supplies to help him make his residence ready.

We conclude that the evidence is legally and factually sufficient to support the trial court's finding that the Department made reasonable efforts to reunite the parents and the children. *See K.W.*, 2024 WL 116938, at \*5 (efforts must be reasonable, "not ideal").

### 3. Law: Continuing Danger

Under section 161.001(f), even if a court finds that the Department made reasonable efforts to reunite the parents and children, it must also find that despite these reasonable efforts, continuing danger remained in the home that prevented the return of the children to the parents. TEX. FAM. CODE § 161.001(f). "'Danger to the physical health or safety of a child' includes exposure of the child to loss or injury that jeopardizes the physical health or safety of the child without regard to whether there has been an actual prior injury to the child." TEX. FAM. CODE § 101.009.

40

**4.      Sufficient Evidence Continuing Danger Remains and Prevents Return of Children to Parents**

In its final decree of termination, the trial court made the following finding:

The Court finds by clear and convincing evidence that the Department made reasonable efforts to return the children to the parents. However, despite those reasonable efforts to return the children home to the parents, a continuing danger remains in the home that prevents return.

The court also made the following findings:

- There is no stability of residence for either parent and neither parent has maintained a level of sobriety.

- Neither party has had meaningful employment.

- As to Father, issues remain concerning people he may or may not be living with, including someone the children should not be around.

- A continuing danger exists as to Mother, who is incarcerated and may not be able to take care of her children in the foreseeable future. She has pled guilty to three crimes involving the children, and there is also the potential for continuing issues with the laws. She has continued to violate court orders and tested positive for cocaine.

- While pregnant, Mother engaged in drinking alcohol when she was supposed to be refraining from alcoholic beverages.

- Both parents continued to miss drug tests. Whether missing the drug tests was intentional or unintentional, the assumption is that if the parents did not take the drug test it was likely to be positive.

- It is very concerning that the parents had issues with substance abuse that affected the children in a negative way including positive test results for James, Alex, and Joseph. This raises concerns for serious danger and possibility for the children to be hurt or injured in some way.

41

- There are concerns with how Zoe's arm was broken and that this child was not injured prior to Mother removing the child but returned to the Department with an injured arm.

- At least two of the children have requirements for significant ongoing therapy in order to have a better life.

- There is a continuing pattern of behavior with regard to both parents.

Mother argues that the evidence does not support the more specific findings in the decree, and Father argues that the decree does not contain a specific finding of continuing danger that was supported by clear and convincing evidence. As to specificity, we agree with the Fort Worth Court of Appeals, which concluded that the statute does not require granulated and specific findings detailing the precise nature of the continuing danger; it requires only a finding that despite reasonable efforts to return a child to the parent, a continuing danger remains in the home that prevents return. *Interest of Y.K.*, 722 S.W.3d 273, 280–81 (Tex. App.—Fort Worth 2025, no pet.). To the extent that Father's complaint is that the finding is insufficiently specific, we overrule that issue.

As to the parents' arguments that the evidence does not support a conclusion of a continuing danger remaining in the home, we observe that there is a considerable overlap between our analysis of the endangerment predicate acts, the best interest of the child factors, and this inquiry.

Mother argues that the evidence was not sufficient to show a continuing danger in the home that prevented return of her children. She argues that evidence

42

that she lacked a stable residence or employment is merely evidence of poverty that is not sufficient to terminate her rights. Mother also argues that evidence that she was incarcerated and "may not" be able to care for her children in the future was speculative and insufficient to show endangerment. By the end of trial, Mother was in jail, where she had been for seven months. This rendered her physically unable to care for her children, so there was no maternal home in which they could reside in her absence. *See Interest of P.Y.*, No. 14-25-00696-CV, —S.W.3d—, —, 2026 WL 363515, at *7 (Tex. App.—Houston [14th Dist.] Feb. 10, 2026, no pet.). Despite working with both Mother and Father, none of the people suggested as potential caregivers for the children were available, willing, or appropriate. *See id.* And even if Mother had been released from jail, Williams testified that E.E.'s home was in a state of disrepair that made it inappropriate for the children.

Father argues that the order does not explain how housing stability and sobriety is a continuing danger to the children. Williams testified that he was not sure where Father was living, but when he investigated the home that Father had shared with K.W., he observed risks, like a microwave duct-taped to the wall, that created a risk of physical injury should the children be returned to his care. The evidence at trial showed Father's history of drug use, the effects it had on his parenting, the exposure of the children as documented by their positive cocaine test results, and that he continued to use cocaine throughout the case despite two court

43

orders prohibiting it. A reasonable factfinder could conclude from this evidence that Father's presence in the home created a continuing danger that his potentially impaired parenting created a continuing danger that the children could be harmed.

The evidence showed that Mother had little gainful employment during the 22 months from when the boys were removed to the conclusion of trial. That evidence was Mother's testimony that she worked for a month at the cotton shed and worked for friends and relatives, including E.E., who exchanged residence in her home for Mother's work. There was no evidence of Mother's actual resources or how she could, were she released from jail, provide the children with the basic necessities.

Similarly, about a month before the end of trial, Father signed a pauper's oath affidavit showing that he had $0 in income and $0 in resources. There was thus no evidence of how he could provide the children with basic necessities, the absence of which could be considered a continuing danger to the children who were too young to advocate for themselves.

Mother and Father argue that there was no corroborating evidence showing how the children were exposed to cocaine or whether each was the cause of the children's exposure. Mother also argues that the Department did not present the cocaine test results for the children, and that Mother's drug tests were all negative for any illegal substance. We agree that the trial court's finding that Mother tested

positive for cocaine appears to be erroneous because it was Father who tested positive for cocaine four times during the case. But we disagree with Mother's suggestion that the children's positive cocaine tests were not introduced at trial (they were). In November 2023, James, Alex, and Joseph were 4, 3, and 2 years old. Mother testified that Father used cocaine at home, and she used cocaine with him. A reasonable factfinder could conclude from the evidence that both parents either directly exposed the children to cocaine or permitted their young children to be in an environment in which they were exposed to cocaine leading to their eventual positive drug tests.

Mother argues that the prior use of drugs is not clear and convincing evidence of danger in the absence of evidence of current use. And she says that the court's assumption that missed drug tests would likely be positive was illogical and not clear and convincing evidence of continuing danger. Both parents' family service plans were made by orders of the court, and both provided that if the parent failed to submit to testing on the requested date, the test would be treated as a positive result. Nevertheless, both parents failed to appear or refused to permit drug testing, particularly hair follicle testing. Moreover, Mother continued to drink alcohol, at times excessively, even when despite being ordered by both the family court and the criminal court not to do so, as evidenced by the 0.34 blood alcohol test from her hospital admission in the third trimester of her pregnancy with Zoe. A

reasonable factfinder could conclude that both parents continued to have issues with substance abuse that could constitute a continuing danger to the children.

Mother speculates that L.P., Williams, or the foster mother broke Zoe's arm, saying there is no evidence to support the trial court's finding that there were concerns about how Zoe's arm was broken because it was broken only after Mother returned Zoe to the Department. However, no evidence in the record supports a conclusion that L.P., Williams, or the foster mother broke Zoe's arm, whereas Williams testified that almost immediately after placing Zoe with her foster mother, the foster mother informed him that she was in distress, and something was wrong with her arm. A reasonable factfinder could find this circumstance concerning. Moreover, the trial court, as the sole fact finder, was at liberty to make credibility determinations on this issue.

Finally, Mother references a therapist's note and argues that the therapist recommended returning the children to her with the Department monitoring for three months. Mother's Br. 54. Mother refers to the closing discharge report from the therapist who worked with Mother beginning in January 2024 when she was in the Galveston County Jail. In the closing discharge report, dated October 10, 2024, the therapist stated that Mother was being discharged for failing to show up for therapy sessions or reschedule. The therapist reported: "Client completed 12 sessions of individual counseling and completed a psychosocial evaluation. She

also completed Empowering Families class. Client has no showed her last 2 sessions and has not contacted therapist to continue her counseling. Client did admit to drinking during her last pregnancy. Client received domestic violence education and reported no plans to reunite with her children's father." The bottom of the report included the following statement:

> Closing Recommendations: (Gradual return, DFPS to monitor for 3 months, CD Assessment or other): Therapist recommends that client be discharged from counseling as she does not appear to be able to establish a regular pattern of attendance.

We disagree with Mother's characterization of this note. The trial court could have reasonably construed the note as stating that the therapist recommended nothing more than that Mother be discharged from counseling because she was unable to establish a regular pattern of attendance. The words in parentheses appear to be a list of possible closing recommendations because of the inclusion of the words "or other." We disagree that this is evidence that a factfinder was required to credit in favor of a conclusion that there was no continuing danger that prevented the return of the children to Mother.

We conclude that the evidence is legally and factually sufficient to support the trial court's finding that despite the Department's reasonable efforts to return the children home to the parents, a continuing danger remained in both parents' homes that prevented the return of the children to either parent. *See R.R.A.*, 687 S.W.3d at 276 (legal sufficiency); *A.C.*, 560 S.W.3d at 631 (factual sufficiency).

47

## C. Statutory Termination Standard

As we mentioned in part I.A., above, a "parent's rights to the 'companionship, care, custody, and management' of his or her child is a constitutional interest "far more precious than any property right." *Santosky*, 455 U.S. at 758–59; *accord M.S.*, 115 S.W.3d at 547. The United States Supreme Court has emphasized that "the interest of [a] parent[ ] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick*, 685 S.W.2d at 20 (internal quotations omitted); *see also In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023) ("Both this Court and the Supreme Court of the United States have long recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). Consequently, as we said in part I.A., we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

A court may terminate the parent-child relationship under Section 161.001 of the Family Code if the Department establishes, by clear and convincing evidence, that (1) the parent has engaged in one or more of the enumerated

predicate acts or omissions under Section 161.001(b)(1) and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). "Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact." *In re M.A.J.*, 612 S.W.3d 398, 406 (Tex. App.—Houston [1st Dist.] 2020, pet denied). Only one predicate finding under Section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, when a parent challenges a trial court's termination based on the endangerment predicate acts, TEX. FAM. CODE § 161.001(b)(1)(D)–(E), due process requires the appellate court to detail its analysis as to those grounds "because of the potential consequences for parental rights to a different child." *Interest of N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) ("When a parent has presented the issue on appeal, an appellate court that denies review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children.").

B.    **Endangerment Predicate Acts**

Two predicate act provisions in the Family Code address endangerment. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). Under subsection (D), parental rights may be terminated if the person "knowingly allowed the child to remain in

49

conditions or surroundings which endanger the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(D). Under subsection (E), a person's parental rights may be terminated if the person "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). To "endanger" in this context means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Importantly, although paragraphs (D) and (E) require conduct that places the child in danger or knowledge that conditions or other persons place the child in danger, these paragraphs do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[ ] injury.'" *C.E.*, 687 S.W.3d at 310 (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (internal quotation marks omitted)). "Proof that a parent specifically caused an injury is not necessary." *Id.* (citing *Boyd*, 727 S.W.2d at 533).

### 1. Endangering Environment, § 161.001(b)(1)(D)

"[T]ermination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment." *C.E.*, 687 S.W.3d at 310. "Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment." *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Allowing a child to

50

remain in the care of a parent who is known to be violent and abusive or a known abuser of illegal drugs can support termination under subpart (D). *Id.* at 722. "The suitability of a child's living conditions and the conduct of parents or others in the home are relevant" to this inquiry. *See In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan*, 325 S.W.3d at 721. "A parent's illegal drug use . . . may also support a finding that the child's surroundings endanger his or her physical or emotional wellbeing." *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied). Under subsection (D), termination may be based on a single act or omission. *Jordan*, 325 S.W.3d at 721. And the relevant time frame for evaluating endangerment under subsection (D) is prior to the child's removal. *J.W.*, 645 S.W.3d at 749 & n.12.

### 2. Endangering Conduct, § 161.001(b)(1)(E).

"[T]ermination under (E) requires that a parent's conduct endanger the child's physical or emotional well-being." *C.E.*, 687 S.W.3d at 310; *see In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("A child is endangered if his environment creates a potential for danger that the parent disregards."). "Conduct that subjects a child to life of uncertainty and

instability endangers the child's physical and emotional well-being." *Jordan*, 325 S.W.3d at 723. Endangering conduct is not limited to actions directed at the child. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see Interest of D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

Termination under Subsection (E) must rest on more than a single act or omission; instead, this subsection requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re R.R.*, 711 S.W.3d 126, 139 (Tex. App.—Houston [1st Dist.] 2024, no pet.). We may consider the parent's actions before the child's birth "while the parent had custody of older children." *J.O.A.*, 283 S.W.3d at 345. And we may consider conduct that occurred after the Department removed the child from the parent's care. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional wellbeing." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

Domestic violence, want of self-control, and propensity for violence are evidence of endangering conduct, even when that conduct did not result in a criminal conviction. *Interest of B.D.Z.P.*, No. 01-25-00457-CV, 2025 WL 3636289, at *12–13 (Tex. App.—Houston [1st Dist.] Dec. 16, 2025, pet. denied) (mem. op.). "Intentional criminal activity that exposes a parent to incarceration is

conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Although "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child," incarceration supports an endangerment finding "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional wellbeing of the child." *J.F.-G.*, 627 S.W.3d at 312–13 (quoting *Boyd*, 727 S.W.2d at 533–34). A parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *N.J.H.*, 575 S.W.3d at 832. This is so even when the parent's substance abuse does not directly or physically harm the child and is not done in the child's presence. *See J.O.A.*, 283 S.W.3d at 345; *R.R.A.*, 687 S.W.3d at 278; *N.J.H.*, 575 S.W.3d at 831. A parent's substance abuse and its effect on his or her ability to parent may qualify as an endangering course of conduct. *See J.O.A.*, 283 S.W.3d at 345; *R.R.A.*, 687 S.W.3d at 278; *D.L.W.W.*, 617 S.W.3d at 78.

### C. Legally and Factually Sufficient Evidence of Endangerment

#### 1. Endangering Environment

The evidence in this case is that Mother and Father each engaged in a course of conduct that endangered the physical and emotional well being of their children, and that each, aware of the other parent's endangering conduct, permitted the children to remain in the endangering environment with the other parent. *See Jordan*, 325 S.W.3d at 721.

The evidence showed that the Department had been involved with this family over allegations of violence, physical abuse of children, and domestic violence on the part of both parents and substance abuse, including alcohol, marijuana, and cocaine, by both parents in the two years leading up to the removal of James, Alex, and Joseph. From this evidence, a reasonable factfinder could conclude that Father was well aware of Mother's insobriety, violence, and lack of control, and that Mother was well aware of Father's insobriety, violence, and lack of control. *See id.*

Mother testified that she was aware of Father's use of cocaine, that he used cocaine in a bathroom to which the children had access, and that she regularly joined him in using cocaine at home. *See E.M.*, 494 S.W.3d at 222. James, Alex, and Joseph all tested positive for cocaine by hair follicle testing when they were removed and placed in foster care, from which a reasonable factfinder could

conclude that they had actually been in an endangering environment due to the presence of illegal drugs at home. Further evidence showed that Mother remained with Father and allowed her children to remain in the home with him because he paid the rent. Likewise, the evidence showed that Father allowed his children to remain in the home with Mother because he relied on her to take care of the children.

We conclude that the evidence is legally and factually sufficient to support the trial court's findings that Mother and Father committed the predicate act of endangerment under Texas Family Code § 161.001(b)(1)(D). *See R.R.A.*, 687 S.W.3d at 276 (legal sufficiency); *A.C.*, 560 S.W.3d at 631 (factual sufficiency).

### 2. Endangering Conduct

The evidence in this case also supports a conclusion that each parent violated subpart (E).

*Mother.* The evidence showed that Mother abused alcohol and engaged in behavior that was violent and lacking in control in November 2023 when she threw a wine bottle and glass shards at an older child. After pleading to three charges of child endangerment in exchange for deferred adjudication community supervision, and promising to follow a family service plan, Mother jeopardized her relationship with her children by engaging in conduct that violated both the conditions of her

probation and the family service plan. *See J.F.-G.*, 627 S.W.3d at 312–13 (quoting *Boyd*, 727 S.W.2d at 533)

While pregnant with Zoe, she was hospitalized with a blood alcohol content of 0.34, a level of intoxication that showed she was not compliant with requirements to avoid the use of alcohol. She twice tested positive for alcohol, and she refused to submit to hair follicle testing despite the court order to do so and warning that failing to submit to a drug test would be considered as a positive test. Mother admitted to past use of cocaine and marijuana, and that she used drugs around her children, including the three children below the age of five. *See J.O.A.*, 283 S.W.3d at 345.

Mother took one-month-old Zoe from her safety placement without permission, and when she returned the child late that night, Zoe was in distress and found to have a spiral fracture to her arm. Indeed, Mother had been jailed in Galveston County for about six months prior to the final day of trial in this case, in addition to the several months she spent in jail in Galveston County in 2024 in connection with the child endangerment charges. Her incarceration restricted her ability to visit her children and made a return of the children impossible so long as she remained in jail. Mother also violated various other conditions of probation, including maintaining sobriety and avoiding alcohol, performing community service, paying fines, and regularly checking in, all of which contributed to the

basis for the motion to adjudicate and revoke her community supervision. *See V.V.*, 349 S.W.3d at 554.

We conclude that the evidence shows a continuing course of endangering conduct that is legally and factually sufficient to support the trial court's finding that Mother committed the predicate act of endangerment under Texas Family Code § 161.001(b)(1)(E). *See R.R.A.*, 687 S.W.3d at 276 (legal sufficiency); *A.C.*, 560 S.W.3d at 631 (factual sufficiency); *R.R.*, 711 S.W.3d at 139 (continuing course of conduct).

*Father.* The evidence showed that Father abused cocaine in the family home and engaged in behavior that was violent and lacking in control. Father tested positive for cocaine four times during the course of this case, and Mother's testimony showed that he had a prior pattern of habitually using cocaine. *See In re M.T.W.*, 01-11-00162-CV, 2011 WL 6938542, at *13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with [his] children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of [his child]."). Like Mother, Father received deferred adjudication community supervision on three charges of child endangerment involving the children's positive drug tests, and he agreed to follow a family service plan, both of which required him to

maintain his sobriety. But drug tests in this case and in relation to his probation showed that Father did not maintain his sobriety. By voluntarily using illegal drugs, Father jeopardized his relationship with his children by violating both the family service plan and the conditions of his probation. *See id.* Although no motion to revoke Father's community supervision appears in the record, the factfinder could consider the instability created by Father's conduct, which created a risk that he would be imprisoned. *See V.V.*, 349 S.W.3d at 554.

Mother also testified that Father assaulted her just after the boys were removed from their care in 2023. Although this violence was perpetrated against Mother and outside the presence of the children, a reasonable factfinder could consider this evidence of endangering behavior in the family home to which the children would have been exposed if returned to the parents. *See B.D.Z.P.*, 2025 WL 3636289, at *12–13. The evidence also showed that Father did not avoid criminal activity. While the exact nature of the crime for which he was charged in Galveston County was not included in the record, the pauper's oath application was admitted at trial. A reasonable factfinder could consider this as some evidence that Father did not avoid criminal activity, which endangers his ability to care for his children.

We conclude that the evidence shows a continuing course of endangering conduct that is legally and factually sufficient to support the trial court's finding

that Father committed the predicate act of endangerment under Texas Family Code § 161.001(b)(1)(E). *See R.R.A.*, 687 S.W.3d at 276 (legal sufficiency); *A.C.*, 560 S.W.3d at 631 (factual sufficiency); *R.R.*, 711 S.W.3d at 139 (continuing course of conduct).

* * *

Having found that the evidence is legally and factually sufficient to support the trial court's findings of both endangerment predicate acts, we conclude that we do not need to consider the parents' challenges to the sufficiency of the evidence to support the predicate act of 161.001(b)(1)(L). *See A.V.*, 113 S.W.3d at 362 (holding that only one predicate finding is necessary to support termination judgment when there is also finding that termination is in child's best interest). Accordingly, we do not address Father's second and fifth issues and part of Mother's second issue. We overrule the remainder of Mother's second issue and Father's third and fourth issues.

### D.    Best Interest of the Child Legal Standards

Both parents have also challenged the trial court's finding that termination of the parents' rights is in the best interest of the children.

The purpose of the State's intervention in the parent-child relationship is to "protect the best interests of the children, not to punish parents for their conduct." *A.V.*, 113 S.W.3d at 361. The best-interest inquiry is "child-centered and focuses

59

on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see B.D.Z.P.*, 2025 WL 3636289, at *16.

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Courts may consider circumstantial evidence, subjective factors, and the

totality of the evidence as well as direct evidence when conducting a best interest analysis. *Interest of E.N.T.*, No. 01-25-00346-CV, 2025 WL 3083879, at *38 (Tex. App.—Houston [1st Dist.] Nov. 5, 2025, no pet.) (mem. op.).

We may also consider the statutory factors under Texas Family Code Section 263.307, including (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A factfinder may also infer that past conduct endangering

the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.). Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

### E. Application of *Holley* and Statutory Factors

#### 1. Desires of the Children, Age of Children.

By the end of trial, James was 5 years and 11 months old, Alex was 4 years and 9 months old, Joseph was 3 years and 8 months old, and Zoe was 1 year and 1 month old. The evidence was that all the children had been well cared for by their respective foster families and had spent minimal amounts of time with their parents. The children were too young to express their desires, but Williams testified that he thought James might like to maintain contact with family. Because the children were too young to express their desires but bonded to and well-cared for by their foster families, the factfinder could conclude that these factors weigh in favor of termination. *See B.D.Z.P.*, 2025 WL 3636289, at *18.

**2.	Present and Future Physical and Emotional Needs of the Children; Present and Future Emotional and Physical Danger to the Children, Children's Physical and Mental Vulnerabilities.**

The evidence showed that James and Zoe were developing typically and showed no evidence of developmental delays or fetal alcohol syndrome. Because they are young and unable to advocate for themselves, however, they are mentally and physically vulnerable as all young children are. They will need a safe and stable home environment and safe and stable caregivers to provide for their basic needs. The evidence also showed that Alex and Joseph have autism and developmental and speech delays. In addition to the needs common to all children, they will need specialized care, therapy, and education to reach their full potential in light of their diagnoses. The evidence showed that these needs have so far necessitated a number of appointments and in home therapies, along with caregivers who, like the foster parents, are open to learning techniques to address each child's needs.

**3.	Parental Abilities of Persons Seeking Custody; Stability of the Home or Proposed Placement; Plans for the Children by Individuals or Agency Seeking Custody; Demonstrated Adequate Parenting Skills (including providing children with adequate health & nutritional care, a safe physical home environment, and understanding of the children's needs).**

The Department sought termination of the parents' rights to all four children. The evidence showed that both parents had attended some visitations, and their interactions during those visitations were good or adequate. But neither parent had

demonstrated that he or she had a safe and stable home environment or resources to provide minimally adequately for the children's basic needs. The Department was unsure where Father was living, but Williams testified that the home he shared with K.W. was not appropriate because of the presence of K.W. And the month before the final days of trial testimony, Father signed a pauper's affidavit in an unrelated case indicating that he had no income and no financial resources.

Mother was in jail on the last day of trial, where she had been for about seven months. She had no job, and throughout the pendency of the case, she did not have stable housing appropriate for her children. She testified that she briefly stayed in motels, and she also lived in various friends' homes for short periods of time and in shelters, until she moved in with E.E. But Williams testified that E.E.'s home was in a state of disrepair and uncleanliness that made it inappropriate for the children. In addition, the presence of E.E.'s adult son, as to whom no background check had been conducted, was a potential impediment to placing the children there, even if Mother were released from jail. Mother testified that she had worked for relatives and close friends, but there was no evidence that she was paid for such work in addition to the agreement she had to live in E.E.'s home in exchange for performing tasks. Mother testified that she worked at the "cotton shed" in Galveston, but only for one month because her work schedule there made it impossible for her to attend visits with her children. The record also showed that

Mother may have worked briefly at a beauty supply store, but there is no evidence about how much she earned or how long she worked there.

Neither parent had demonstrated an appreciation or understanding of the special needs of Alex and Joseph. Mother testified that she would take her children to all necessary appointments, but when the Department offered her the opportunity to attend therapy after Alex was initially diagnosed with autism, Mother did not attend. Father attended only a single therapy session, but he did not attend many visits with Zoe. During her visits, Mother demonstrated some emotional instability that resulted in her leaving visitations with Zoe early or abruptly, and she occasionally demonstrated an inability to deal with her sons' behaviors.

In contrast, the Department presented evidence that both James and Zoe were thriving in independent foster-to-adopt placements that provide for their needs and coordinate with each other and Alex and Joseph's foster parents to ensure that the siblings remain in contact with each other. Both M.H., the foster mother, and Williams testified that Alex and Joseph, who were growing and gaining skills appropriate to address their diagnoses, would stay with M.H. and her family as long as necessary for the Department to find them both adoptive homes. The evidence showed that M.H. and her family were meeting their needs and ensuring that they received all necessary therapy and educational interventions

available. M.H.'s testimony also demonstrated that she had learned and implemented specific techniques for parenting Alex and Joseph specifically.

These combined factors weigh in favor of termination.

### 4. Existence of an Adequate Social Support System of Extended Family and Friends Available to the Children.

At trial Mother testified generally that she had put together a support system through her church. But throughout the case, both Williams and Knox repeatedly worked with the parents to find family and friends ("fictive kin") to care for and support the children, to no avail. In contrast, Williams testified that he had worked with the foster families to ensure that the children remained in contact with their siblings.

### 5. Programs Available to Assist Persons Seeking Custody in Promoting the Best Interest of the Children; Willingness to Complete Services, Facilitate Supervision by Department, and Effect Positive Changes within a Reasonable Time Period.

In this case, both parents completed some of the services required by the Department and the court in the family service plans, including parenting classes and counseling. But both parents failed to complete some services and despite frequent reminders, failed to provide adequate proof of safe and stable living conditions, employment, and sobriety. Notably, both Williams and Knox, who had followed the combined cases from when the children were removed, testified that

neither parent had demonstrated positive change in the nearly 22 months since the boys were first removed to foster care. These factors weigh toward termination.

### 6. Acts or Omissions of the Parents Suggesting the Existing Parent-Child Relationship is Not Appropriate.

In Section II.C, above, we analyzed the legal and factual sufficiency to support the trial court's endangerment findings. All of the evidence that supported our conclusion that the evidence was legally and factually sufficient to support the trial court's endangerment findings likewise demonstrates that the existing parent-child relationships between Mother and Father and each of the four children are not appropriate. *See C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest). This includes evidence of the parents' history of violence and uncontrolled conduct, continuing substance abuse, and criminal activity subjecting each of them to the risk of incarceration. In light of the parents' history, this factor weighs toward termination.

\* \* \*

Having considered both the *Holley* and the statutory factors, we conclude that the evidence is both legally and factually sufficient to support the trial court's findings that termination of the parents' rights was in the best interest of the children. *See* TEX. FAM. CODE § 263.307(b); *Holley*, 544 S.W.2d at 371–72; *see also R.R.A.*, 687 S.W.3d at 276 (legal sufficiency); *A.C.*, 560 S.W.3d at 631 (factual sufficiency).

67

## Conclusion

We affirm the decree of the trial court.

Susanna Dokupil
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.